## STATE OF VERMONT
## PROFESSIONAL RESPONSIBILITY PROGRAM

In re: William Cobb, Esq.
PRB No. 2020-99 and 2020-103

### Decision No. 246

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER OF SUSPENSION

In this Order, the Panel concludes that Respondent committed five separate violations of

the Vermont Rules of Professional Responsibility and issues Respondent a cumulative sanction

of suspension for a period of one year and three months and a public reprimand for those

violations.

### PROCEDURAL BACKGROUND

Disciplinary Counsel filed a petition of misconduct against Respondent, William W.

Cobb.

The petition of misconduct filed by Disciplinary Counsel alleged five instances of

misconduct Respondent relating to the handling of two separate matters. The Panel held two

remote evidentiary hearings with consent of the parties to this format. The hearings occurred on

October 15, 2021, and November 1, 2021.

On October 5, 2021 – ten days before the first day of the scheduled merits hearing in the

above matter – Disciplinary Counsel filed a Motion for Protective Order with the Hearing Panel.

The motion consisted of two requests: first, a request that Disciplinary Counsel be allowed to

submit into evidence, for the public record, certain documents in redacted form. The proposed

redactions relate to a juvenile proceeding. In accordance with Rule 9(a)(2)(D) of the Vermont

Rules for Public Access to Court Records ("Access to Court Records Rules"), Disciplinary

Counsel submitted both a proposed set of redacted exhibits and an unredacted set of the exhibits,

under seal, for the Panel's evaluation of the redactions and for the Panel's confidential consideration of the unredacted exhibits in this proceeding.

Secondly, Disciplinary Counsel requested that the Panel provide for the confidentiality of witness testimony that might reveal confidential information related to the juvenile proceeding. Because the merits hearing was scheduled to be held remotely in this proceeding and public access to the hearing was to be afforded through a "livestream" on the Judiciary's YouTube channel, the motion requested that testimony which would reveal confidential information "not be broadcast" during the livestream.

The potentially confidential information was not identified with specificity in the motion. Disciplinary Counsel stated only that certain witnesses "might" be required as a result of questioning to disclose information related to the juvenile proceeding. For two of the four witnesses identified, the motion stated that the witness might be required to "disclose some (minimal) information about that proceeding." The potentially confidential information was not identified with specificity in the motion. Disciplinary Counsel stated only that certain witnesses "might" be required as a result of questioning to disclose information related to the juvenile proceeding. For two of the four witnesses identified, the motion stated that the witness might be required to "disclose some (minimal) information about that proceeding."

In addition, Respondent has separately offered into evidence in this proceeding one exhibit containing redactions. Those proffered redactions pertained to the same juvenile proceeding.

The Panel considered the motion and on the first day of the hearing, consistent with the Panel's understanding of the Vt. Rules for Public Access to Court Records ("Access Rules"), issued a preliminary order establishing procedures for the consideration of purportedly

2

confidential testimony and exhibits at hearing, reserving the right to modify its order post-hearing.

Following the hearing, the Panel issued a subsequent order on November 4, 2021, finalizing its ruling on the confidentiality of certain exhibits under the Access rules. That order further instructed Disciplinary Counsel to file a redacted copy of the transcript for the Panel's consideration as to whether certain witness testimony need also be redacted to balance the statutory protections for juvenile information against the default of public access established under the Access Rules. Disciplinary Counsel timely filed the redacted transcript for the Panel's review. Having reviewed the transcript and the legal standards set forth in the aforementioned orders of November 4, the Panel hereby orders that redaction of the transcript as filed by Discipline Counsel and without objection from Respondent is in keeping with the requirement that "the least restrictive means have been employed to preserve the presumption of openness and to protect the specific interests found to justify sealing of the record." Access Rules, Rule 9(a)(2)(4).

The Panel's November 4, 2021, Order also invited the parties to submit briefing proposing findings of fact and conclusions of law for the Panel's adoption. The parties submitted their respective proposed findings and conclusions on January 3, 2022.

The Panel wishes to explain the extenuating circumstances that caused the delay in the issuance of this Order and to thank the parties and the witnesses for their patience in awaiting our decision. It is with great sadness that the Panel acknowledges the passing of its long-time staff attorney, Mark DiStefano, Esq. Among his many invaluable contributions to the Professional Responsibility Program, Attorney DiStefano aided this Panel in preparation for and conduct of the remote hearings in this matter. Attorney DiStefano also participated in the Panel's post-

3

hearing conference at which it deliberated on the outcome of the case and identified next steps in the legal research and decision-making process. Regrettably, while we awaited briefing from the Parties, Attorney DiStefano resigned from his staff attorney position following his diagnosis with the advanced illness that ultimately took his life.

The Panel was fortunate in that the Professional Responsibility Board was able to find, after some delay, substitute staff counsel services from Shannon Bertrand, Esq. Because Attorney Bertrand was not present for the hearings, he understandably needed additional time to familiarize himself with the record so that he could assist the Panel in completing its deliberations and drafting this order. For these reasons, the all-volunteer Panel was unable to issue this Order sooner. We regret any inconvenience and distress that this extended timeline may have caused those involved in the case.

## FINDINGS OF FACT

1. Respondent is an attorney licensed to practice law in the states of Vermont, New York and Connecticut. He is a sole practitioner in St. Johnsbury and is also the Probate Judge in Caledonia County. Respondent has practiced law since 2000 and his practice focuses on criminal defense, family law and civil litigation.

## COUNT 1-VIOLATION OF RULE 8.4(d) DISCLOSURE OF CONFIDENTIAL JUVENILE COURT INFORMATION.

2. Respondent represented KH in connection with a wrongful death claim of his minor child AJ. After a Department of Children and Family (DCF) "CHINS" proceeding in the Family Division, Washington Unit, AJ was placed into State custody. AJ subsequently died while in State custody.

3. The underlying wrongful death claim had been settled. However, KH (the father) and KL

4

(the mother) were unable to agree upon the distribution of the wrongful death proceeds. Respondent represented KH in the resulting dispute over the distribution of wrongful death proceeds.

4. KL filed a petition with the Washington County Civil Division seeking a distribution of the wrongful death proceeds. In that proceeding, KH, as represented by Respondent, disputed that the mother should receive any of the proceeds.

5. As part of his representation of KH, Respondent obtained the juvenile case file from Attorney Larry Myer. Attorney Myer had represented KH in the underlying DCF proceeding. Pursuant to Respondent's request and KH's authorization, Attorney Myer turned over KH's entire client file to Respondent, including the records of the DCF proceeding.

6. On January 11, 2020, Respondent filed a motion for summary judgment in the civil matter, including a memorandum of law, statement of undisputed material facts and exhibits in support of the motion. The motion sought to prevent KL from receiving proceeds from the wrongful death claim because of the mother's treatment of AJ as determined in the DCF proceeding.

7. Respondent filed certain records of the DCF juvenile court proceeding as exhibits in support of the motion. On the advice of a fellow attorney, Respondent filed the exhibits "under seal" by placing them in a sealed envelope. Respondent did not, however, file a motion to seal the exhibits or the motion for summary judgment that disclosed and excerpted information from those "under seal" exhibits.

8. Respondent's motion for summary judgment, which became a matter of public record pursuant to Vermont's Rules on Public Access to Court Records, included specific reference to the birth mother's name, the first and last name of another one of mother's then-minor children

5

(AC) and other specific information taken directly from the DCF file.

9. Respondent's motion for summary judgment further identified the deceased child in full as well as the full identity of the child's biological parents. *See* Exhibit 2.

10. Respondent believed that, because KH had personal knowledge of all the facts disclosed from the DCF file as part of Respondent's motion, Respondent did not need to take steps to protect the information from the DCF files from disclosure.

11. Nonetheless, prior to filing his summary judgment motion with the Washington Civil Division, Respondent requested from the Washington Family Division a copy of the underlying DCF file, which are generally not publicly available because of various state statutes making such records confidential.[1]

12. Respondent's request to the Family Division for certified copies of the DCF proceeding records was opposed by KL's counsel in that proceeding, who argued to the Family Division that Respondent had failed to make any showing in his request for access to the records that would overcome the default statutory confidentiality of those records.

13. Respondent did not wait for a response from the Family Division before filing the motion for summary judgment on KH's behalf, which included the Family Division records Respondent had previously obtained from Attorney Meyer. The Family court subsequently denied his request for the file.

14. Respondent was aware of the default, statutory confidentiality of the juvenile records but believed that he could use them in context of the civil case between KL and KH.

15. The Panel notes that the juvenile records Respondent received from Attorney Myer were not marked as confidential; however, Attorney Meyer credibly testified that he would have

---

[1] *See* 33 V.S.A. §§ 5110, 5117(a), 5118.

6

expected Respondent to be aware of and abide by state laws regarding confidentiality of Family Division records involving juveniles.

16. After submitting the records of the DCF proceeding informally "under seal" and excerpting the sensitive identifying information from those records in his initial motion for summary judgment, Respondent filed a reply to his adversary's opposition to motion for summary judgment and also sought a declaratory ruling from the Washington Civil Division regarding the appropriate use of the confidential juvenile information and records. Respondent testified at the hearing in this proceeding that he believed that such confidential information could properly be used in the wrongful death case and his reply memorandum, filed well after Respondent disclosed the otherwise confidential information in his initial filing.

17. Respondent took no steps to formally seal or otherwise maintain the confidentiality of the information contained in his motion and statement of undisputed material facts. The Washington Civil Division did not rule on his request for declaratory relief because the wrongful death case was settled.

# COUNT 2-VIOLATION OF RULE 1.1 FAILURE TO PROVIDE COMPETENT REPRESENTATION BY FAILING TO OBTAIN OR REVIEW RECORDINGS OF ALLEGED VICTIM INTERVIEWS.

18. Respondent represented client MK in a criminal matter. MK was arrested and charged with sex crimes in both Caledonia County and Windsor County. Respondent agreed to represent MK in the case in Windsor County but did not represent MK in the Caledonia County case due to Respondent's position as Probate Judge in Caledonia County.

19. Respondent and client's fee arrangement called for a flat monthly rate of $1000 per month for the first eight months and then, if the case was still pending, a flat fee of $400 per

7

month. *See* Exhibit 11. During Respondent's representation of MK, Respondent collected $8,000.00.

20. The Windsor County State's Attorney provided Respondent with discovery including written statements from the investigating officer regarding MK's alleged crimes against the minor complaining witness.

21. There were also video recordings of the alleged victim interviews with the police. However, to view the original recordings, Respondent would have had to request such recording directly from the investigating police department.

22. At no time did Respondent request the recordings or otherwise watch the recorded police interview of the alleged victim from Windsor County.

23. On August 22, 2019, Respondent received from the Windsor County State's Attorney an offer to resolve the criminal charges against MK. At that time, Respondent had not reviewed the recordings of the alleged victim interviews but had reviewed only the probable cause affidavits.

24. Respondent discussed the settlement offer with MK who rejected the offer and indicated that he would not accept a plea that would require him to serve any prison time.

25. Because Respondent declined to represent MK in the Caledonia County matter due to Respondent's service as a Caledonia Probate judge, MK was represented there by Alan Franklin.

26. Although Alan Franklin did not personally review video recordings of the alleged victims' interviews in the Caledonia case, he did have an associate in his office review the recordings.

27. MK made it clear to Respondent that he would not accept a deal with a lengthy prison sentence. Given his client's position, Respondent should have negotiated further with the State's Attorney to seek a better deal or should have engaged in discovery to prepare for trial. He did

8

neither.

28. Respondent entered into a scheduling order with the Windsor County State's Attorney which required Respondent to complete depositions by November 15, 2019. Respondent did not depose anyone in the case or move to extend the scheduling order.

29. The matter was scheduled for a jury draw in Windsor on February 15, 2020.

30. Respondent indicated that it was standard practice for serious cases that the court would extend the scheduling orders, including deposition deadlines. In fact, here, the charges against MK are still pending and he has not been tried.

31. At the evidentiary hearing in this matter, Disciplinary County called Attorney David Sleigh as a witness. Mr. Sleigh, an experienced criminal defense attorney, has personal knowledge of MK's matters because he took over representation of MK after MK discharged Respondent as his counsel.

32. Attorney Sleigh credibly testified that when he assumed the case from Respondent it appeared that Respondent had done no substantive work to prepare the defense during the roughly eight months that Respondent represented MK.

33. In response to questions from Disciplinary Counsel, Attorney Sleigh explained that he promptly reviewed the recorded interviews with the complaining witnesses after taking on the cases.

34. Attorney Sleigh credibly explained that he did not believe that he could take proper depositions of the complaining witnesses without first viewing the record interviews.

35. Attorney Sleigh further explained that preparing a case for trial by, among other things, taking depositions of complaining witnesses after first reviewing recordings of their interviews with police, maximizes the chances of obtaining a better resolution for the client.

9

36. Attorney Sleigh credibly testified that reviewing the interviews is risk free and can lead to discovery of other information, as it did in this case leading him to DCF records of the alleged victim's troubled past.

37. Attorney Sleigh further credibly testified that reviewing recorded interviews of the complaining witnesses and taking depositions was standard operating procedure for defense attorneys in sexual assault cases.

## COUNT 3-VIOLATION OF RULE 1.3 FAILURE TO PROVIDE DILIGENT REPRESENTATION BY FAILING TO FILE A MOTION TO MODIFY CONDITIONS OF RELEASE PURSUANT TO THE CLIENT'S STATED WISHES.

38. Pursuant to MK's conditions of release on the sexual assault charges in both Caledonia and Windsor County he was not to have any personal contact with his children. Early in the representation of MK, Respondent did get the conditions of release modified so that MK could have telephone contact with his children.

39. MK and his family asked Respondent on several occasions to seek to modify the conditions of release further so that MK could have in-person contact with his children.

40. In October 2019, Respondent asked the Caledonia Deputy State's Attorney whether he would consent to an amendment to the conditions of release to allow MK to see his children in person. The prosecutor indicated that he would not agree to an amendment.

41. Respondent did not ask the same question of the Windsor prosecutor because he believed that both counties would need to amend the conditions of release to achieve MK's desired result. Respondent did not file a motion in Windsor County seeking a modification of the conditions of MK's release to allow him personal contact with his children.

42. Alan Franklin, who represented MK in Caledonia County, agreed that the conditions of

10

release would have to be modified in both counties for the modification to have any effect. Attorney Franklin did not file a motion to amend the conditions of release although he could not remember whether MK had requested such a motion of Attorney Franklin.

43. Attorney Franklin opined that filing motions to amend conditions can be negative for a client and that he does not always file motions to amend conditions of release each time a client asks him. Respondent testified that in his experience, moving to modify conditions of release over the objection of the prosecutor can do more harm than good and can focus the prosecutor's attention on the case.

44. Respondent testified that he had discussed the pros and cons of filing a motion to modify and in his view filing a motion to modify the conditions of release would not be in his client's best interest. Respondent had explained that filing a second motion to amend conditions of release could end up being an overall negative and that the passage of time would often allow a criminal defendant to make a better deal with the State's Attorney. The evidence does not, however, show that Respondent used the time in which he refrained from filing the motion to seek a better deal from the State's Attorney.

45. Respondent offered the testimony of Charles Martin, Esq. as an expert who agreed with Respondent that both the Caledonia and Windsor County conditions would have to be modified in order to allow MK contact with his children.

46. Attorney Martin offered testimony that, in his view, certain decisions such as whether to plead guilty or not guilty always remain with the client, but the attorney's role is to make tactical decisions because of his education, training and experience as to what kind of impact a motion and resulting decision may have in the overall context of the case.

47. MK asked Respondent repeatedly to move to modify his conditions of release, but

Respondent never filed such a motion.

48. Respondent had spoken to the Caledonia State's Attorney in October 2019 about whether he would agree to the amendment of conditions of release.

49. Thereafter, between October 2019 and January 2020, Respondent did not take any further action to move to modify MK's conditions of release despite MK's request.

50. MK discharged Respondent and hired Attorney David Sleigh in January 2020. Attorney Sleigh filed a contested motion to modify MK's conditions of release which was granted in February of 2020. Accordingly, from the time that Respondent reached out to the Caledonia State's Attorney and the time that the motion to modify was granted MK was deprived of seeing his children in person despite repeatedly asking Respondent to file a motion to modify.

51. At all times relevant to this Count, MK has maintained that he is innocent of the charges against him in Windsor County and Caledonia County.

# COUNT 4-VIOLATION OF RULE 1.6 DISCLOSURE OF CONFIDENTIAL CLIENT INFORMATION.

52. In connection with MK replacing Respondent with a new attorney, Respondent transferred MK's file to Attorney Sleigh. In an email to Attorney Sleigh, Respondent laid out additional information including thoughts that he had regarding the possibility of Respondent's continued representation of MK and offering suggestions as to the defense of the case. Exhibit 19.

53. In addition to commenting on MK's case, Respondent offered that he was also representing another criminal defense client and disclosed confidential client information about that unrelated case, including the client's full name, the charges against the other client, and certain admissions that the other client had made.

12

54. The client, BA, had not consented to Respondent's disclosure of his identifying information or consented to allow Respondent to discuss his case with Attorney Sleigh.

55. BA discovered Respondent's unauthorized disclosure of information relating to BA's case from his current attorney, Jessica Burke, who in turn had learned about the unauthorized disclosure from Disciplinary Counsel.

56. The email sent by Respondent to Attorney Sleigh was not disclosed by Attorney Sleigh to anyone but Disciplinary Counsel.

57. At the hearing in this matter, BA testified that he was shocked that Respondent had disclosed information about his case although did not testify to any actual harm from the disclosure. There was no evidence that Attorney Sleigh had disclosed any of the confidential information that he had received about BA from the Respondent.

58. The Panel finds that Respondent's disclosure of BA's confidential information was intended to demonstrate to MK's new attorney the potential value of keeping Respondent on the defense team, thereby positioning Respondent to continue earning a fee in a matter for which he had done and would do very little work.

59. The Panel finds that Respondent's unauthorized disclosure of BA's information was motivated by Respondent's self-serving desire to remain connected to MK's criminal defense.

60. To the extent that Respondent's unauthorized disclosure of information relating to BA's case was also intended to benefit MK, there was no need to identify BA by name or otherwise provide such specific information relating to BA's case to convey to Attorney Sleigh strategic advice that was potentially useful to MK.

# COUNT 5-VIOLATION OF RULE 8.4(c) MISREPRESENTATION TO DISCIPLINARY COUNSEL REGARDING THE CIRCUMSTANCES AND SUBSTANCE OF HIS TIMEKEEPING IN THE MK MATTER.

61. Disciplinary Counsel requested that Respondent provide her with information regarding the time that Respondent had spent on MK's case.[2] In response to the investigation into the complaints against him, Respondent produced a written response dated May 29, 2020. Respondent, through his counsel, provided to Disciplinary Counsel what he claimed were "contemporaneous" time entries of work performed in MK's case using a software program called FreshBooks. *See* Answer at para. 47, Exhibit 15.

62. Respondent admits that the FreshBooks time entries were not created contemporaneously with work done on the MK file and were only recreated by Respondent, to the best of his recollection and after the fact, in response to Disciplinary Counsel's request.

63. Through his testimony Respondent admitted that there may have been dates and times that were not accurate and there might have been "overlap" with other cases upon which he was working contemporaneously with MK file. Because this is not an excessive fee case, the issue is not that Respondent failed to keep contemporaneous and accurate time sheets; the issue is that he misrepresented to Disciplinary Counsel that his time entries were contemporaneous and, even if not contemporaneously made in FreshBooks at the time he did the work, were still accurate based on his notes and calendar entries.

64. Respondent continued to claim that although there may have been some errors in dates or

---

[2] Disciplinary Counsel did not charge Respondent with any changes of an unreasonable fee pursuant to Rule 1.5. The Panel cannot find and does not find a violation of professional conduct for the uncharged violation. However, the Panel notes that the evidence showed Respondent had done little to nothing to prepare and advance MK's file and Respondent's claims of time spent on the file were substantially rebutted by witnesses who denied that they had met with Respondent regarding the case.

times, his FreshBooks time entries were mainly correct. However, other witnesses testified that they had no recollection of meetings reported by Respondent (such as MK's attorney in the Caledonia docket Alan Franklin on October 15, 2021). In addition, Respondent included a time entry for meetings with Windsor County Deputy States Attorney Heidi Remick on June 20, 2019, July 8, 2019, August 19, 2019, and November 11, 2019. Remick testified that none of these meetings ever occurred and Respondent himself admitted he was not sure that they had occurred. *See* October 15, 2021 transcript at 181, 182, 185; 93-99, 104-105 Exhibit 15.

65. Although Disciplinary Counsel did not charge Respondent with charging and excessive fee under Rule 1.5, the Panel concludes based on the evidence and its assessment of the credibility of the witnesses, that Respondent attempted to justify his fee in the MK matter by inflating certain charges such as 10.5 hours to researching a specific juror pool and 9.5 hours for a jury questionnaire when there was no jury draw scheduled and where Respondent was aware that the pool would turn over before any jury draw was scheduled. Exhibit 15.

66. Respondent testified that he had spent the time preparing for a jury draw in the event that he believed that MK would benefit from a "speedy trial." However, such testimony is inconsistent with his testimony stating that deadlines were often extended in felony cases such as MK's and that his delay in moving to modify conditions of release was because he believed it was in MK's interest to delay seeking a modification of release.

67. Respondent's FreshBooks program identified time entries made on only two days; May 20, 2020, and May 21, 2020. These dates were nearly four months after Respondent's representation of MK had ended and created in response to Disciplinary Counsel's inquiry regarding his billing. They were not the contemporaneous entries that Respondent, through counsel, represented them to be.

**Conclusions of Law**

Disciplinary Counsel must prove the charges of professional misconduct by clear and convincing evidence. *See Administrative Order* at 9, Rule 16(c); *in re: PRB Docket NO. 2006-167*, 2007 VT 50, ¶ 6, 181 Vt. 625, 626. "Clear and convincing evidence is a very demanding standard, requiring somewhat less than evidence beyond a reasonable doubt, but more than a preponderance of the evidence" *In re GG*, 2017 VT 10 ¶ 27.

**COUNT 1-VIOLATION OF RULE 8.4(d) DISCLOSURE OF CONFIDENTIAL JUVENILE COURT INFORMATION.**

**Rule 8.4(d).   Misconduct**

Respondent disclosed confidential information contained in a juvenile court file in violation of 33 V.S.A. § 5117. *See* Findings 2-17.

Rule 8.4(d):

"It is professional misconduct for a lawyer to: ...(d) engage in conduct that is prejudicial to the administration of justice."

Rule 8.4(d) involves Respondent's duty to the legal system to maintain the confidentiality of court records. Vermont statute makes it clear that juvenile court records are treated confidentially and that use of information gleaned from any juvenile files without care being taken to maintain confidentiality is prohibited.  33 V.S.A. §5110 declares juvenile proceedings to be confidential and broadly prohibits "any person" from giving any "publicity" regarding a juvenile proceeding except with the consent of the child, the child's guardian ad litem, and the child's parent, guardian, or custodian." 33 V.S.A. §5117(a) further provides as a general rule, subject to specified exceptions not applicable here, that court files relating to a juvenile

16

proceeding "shall not be open to public inspection nor their contents disclosed to the public by any person." *See also* 33 V.S.A. §5118 (recognizing as a general rule that "records of juveniles maintained by the Family Division of the Superior Court should be kept confidential"). Finally, Vermont law also provides that "[juvenile] [f]iles inspected under this subsection shall be marked: UNLAWFUL DISSEMINATION OF THIS INFORMATION IS A CRIME PUNISHABLE BY A FINE OF UP TO $2000.00." 33 V.S.A. §§ 5117(b)(2), & (c)(3)

It is well-settled that a Vermont lawyer's ethical duty under Rule 8.4(d) includes handling of juvenile court material in accordance with the statute.

Even a minor and inadvertent disclosure of confidential juvenile records is a violation of the statute and professional rules. *See In re: PRB Decision number 91* (2006). In that case, an attorney received a private admonition based upon disclosure of juvenile records where the disclosure was limited to questions on cross-examination. When the Judge reminded counsel that such records were confidential, counsel immediately apologized and moved on. There, the panel agreed with Respondent and Disciplinary Counsel's stipulation that the attorney's use of confidential juvenile records in a court proceeding was a violation of Rule 8.4(d) but because of the inadvertent disclosure and certain mitigating factors, an admonition was the proper sanction.

Respondent here was not charged with a crime related to his disclosure of the juvenile file contents. But it is clear from statute and precedent that the information from the juvenile records obtained by Respondent from Attorney Meyer should not have been casually used by Respondent in the civil case without first taking proper precautions to safeguard confidentiality and proactively seeking a ruling from the Civil Division on the propriety of using information from the juvenile files in the civil case.[3] *See In re H.H.*, 2020 VT 107, ¶¶16, 22, _ Vt. _, 251

---

[3] At least not without a proper motion to the court seeking an order sealing the information and allowing the use of the information in the wrongful death case.

A.3d 560. In *H.H.*, the Vermont Supreme Court found that a stipulation filed in a Human Services Board case that had been based upon the record of a CHINS proceeding could not properly be considered by the Human Services Board. *Id. at* ¶22. Here, Respondent used the information from the juvenile case to support his client's motion for summary judgment. Specific facts were used from the record that identified the deceased juvenile, his still-living sibling and his parents, as well as specific findings from the juvenile proceeding.

Respondent filed substantive and detailed confidential information from the juvenile case files without a motion to seal and did not at any time after filing take any steps to rectify the situation. Oddly, prior to making his initial filing, Respondent thought to ask an experienced colleague about use of the juvenile records in the civil case and followed the advice of that fellow attorney by filing the records themselves in a sealed envelope, but not formally moving the court to properly seal the records under applicable court rules. Still, his decision to ask a colleague and to file the records "under seal" signaled that Respondent knew the juvenile records and the information they contained were sensitive. Similarly, Respondent sought the records from the Family Division and was alerted, through that proceeding, to the fact that the Family Division would not release the records for Respondent's purposes and over the objection of mother's counsel in the underlying Family Division case. Respondent did not appeal or seek reconsideration of that Family Division denial.

After submitting the juvenile records and sensitive information contained therein, Respondent was met by mother's objection to the use of the confidential juvenile records in the Civil Division. Respondent then submitted a memorandum to the civil division regarding the propriety of the use of the records under certain circumstances that he claimed pertained in that case. The arguments in Respondent's memorandum are based on arguably analogous cases from

18

other jurisdictions, but none represented on-point precedent from this jurisdiction, including the above-cited Vermont Supreme Court precedent sanctioning an attorney under Rule 8.4(d) for an inadvertent disclosure of similar juvenile information in a civil case. In the face of a statutory scheme layering confidentiality protections on juvenile records and the information contained therein and without clear authority to use the records in the civil case, the Panel concludes that Respondent abused his access to the juvenile records to gain advantage in for his client in the civil proceeding.

The Panel concludes that Disciplinary Counsel proved, by clear and convincing evidence, that Respondent violated Rule 8.4(d).

# COUNT 2-VIOLATION OF RULE 1.1 FAILURE TO PROVIDE COMPETENT REPRESENTATION BY FAILING TO OBTAIN OR REVIEW RECORDINGS OF ALLEGED VICTIM INTERVIEWS.

## Rule 1.1    Competence

Rule 1.1 requires that a lawyer provide competent representation to a client.

Rule 1.1:

"Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." Vt. R. Pr. C. 1.1. The comments specify that "[c]ompetent handling of a particular matter includes . . . use of methods and procedures meeting the standards of competent practitioners." Vt. R. Pr. C. 1.1, cmt. 5.

Respondent was retained by MK, a defendant who maintained his innocence in the face of serious criminal charges and whom Respondent knew was unwilling to take a plea deal involving any prison time. Under the circumstances presented here, Respondent's failure to request and watch the recordings of the victims' interviews was a violation of his duty of

19

competence under Rule 1.1. *See* Findings at 18-37. Rule 1.1 involves Respondent's duty to his client MK in connection with his criminal matter, specifically failing to review victim interviews and not scheduling depositions before the expiration of the time to do so under the scheduling order in the case. Respondent did not review victim interviews in connection with his representation of MK. He believed that the written material and affidavit provided to him by the prosecution gave him adequate information to advise MK initially and that he believed that he would have time to review them later if needed.

The Panel acknowledges that there could be circumstances where a failure to carefully review all of the State's evidence in the first seven months of a representation might not be a violation of Rule 1.1. In this case, however, Respondent's failure to do so calls into question his ability to make judgments about whether to take depositions of the complaining witnesses, whether to retain experts who could review the interview recordings to determine if any flaws in the interview process may have tainted the witnesses, and how aggressively to position his client in settlement negotiations with the Prosecutor. Moreover, the notion that reviewing the cold transcript of the complaining witness interviews is sufficient to assess the credibility of those witnesses grossly understates the importance of assessing a complaining witness' demeanor in sexual assault cases. *See State v. Reid*, 2012 VT 65 ¶¶ 22-25 (describing the factors for determining reliability of child witnesses in sex assault cases, noting that "[o]ne pertinent consideration in this assessment is the propriety of the child's demeanor, including body language and affect," and collecting cases). Defense counsel cannot competently assess this critical credibility/reliability factor pertaining to key witnesses from a transcript alone.

The Panel is particularly struck here by Respondent's decision to let the deposition deadline in the scheduling order lapse without first having reviewed the interviews of the

complaining witness upon whom the entire prosecution relied. Respondent has taken the position that, in his experience, deadlines in Criminal Division scheduling orders are not hard and fast but are often extended to ensure that Defendant's case can be fully prepared for trial. But to count absolutely on the discretion of the court to grant an extension when there was no cause for the attorney to miss the deadline and no attempt to seek an extension before the deadline lapsed is not exemplary of competent attorney behavior.

The specific facts and circumstances surrounding Respondent's representation of MK when combined with the well-recognized importance of demeanor evidence in child sex assault cases, establish that Respondent's failure to request and review the recorded alleged victim interviews prior to the passage of the deposition deadline fell below the standard of competence MK deserved. The Panel concludes that Respondent violated Rule 1.1.

# COUNT 3-VIOLATION OF RULE 1.3 FAILURE TO PROVIDE DILIGENT REPRESENTATION BY FAILING TO FILE A MOTION TO MODIFY CONDITIONS OF RELEASE PURSUANT TO THE CLIENT'S STATED WISHES.

## Rule 1.3. Diligence

Respondent failed to move to modify conditions of relief for client MK to have personal contact with his children despite MK's repeated requests. *See* Findings 38-51.

Rule 1.3:

"A lawyer shall act with reasonable diligence and promptness in representing a client." Rule 1.3 involved Respondent's duty to his client MK in regard to his criminal matter. The official comments to this rule show that Respondent's conduct fell short of this standard in several respects. First, the comments state that "[a] lawyer should pursue a matter on behalf of a client despite opposition, obstruction or personal inconvenience to the lawyer." Rule 1.3, cmt. 1.

21

Second, "[a] lawyer must also act with commitment and dedication to the interests of the client." Rule 1.3, cmt. 2.

Respondent testified that he had discussed with his client whether filing a motion to modify the terms of his release so that he could have in-person contact with his children would be a proper decision. In Respondent's judgment, filing a nonconsensual motion to modify the conditions of release was not a wise decision because of a variety of reasons, including focusing the prosecutor on the case. Delay in acting on a case constitutes a lack of due diligence. *See In re Christopher Moll, Esq.*, PRB Docket No. 2019-032 at page 6. "A client's interests often can be adversely affected by the passage of time. \*\*\* Even when the client's interests are not affected in substance, however, unreasonable delay can cause a client needless anxiety and undermine confidence in the lawyer's trustworthiness." *Id.* (quoting Rule 1.3 cmt. 3). Actual prejudice to a client is not required to prove a violation of Rule 1.3. *Id.* Delay, in and of itself, however, can also be an actual injury to the client. *See In re Scholes,* 2012 VT 56, 192 Vt. 623, 626, 54 A.3d 520, 524 (no actual financial injury but very real anxiety by clients who wanted their bankruptcy cases to be moved forward). Respondent's position is that despite MK's repeated requests to move to modify his conditions of release, it was Respondent's judgment that such a motion would not be in his client's best interest.

Generally, a defense attorney can make decisions based upon his professional judgment concerning most of the everyday decisions of a criminal matter. *See State v. Tribble* 2012 VT 105, ¶54, 67 A.3d 210, 193 Vt. 194 (*Tribble II*). In *Tribble II*, the court analyzed whether a defense counsel's waiver of requiring a state witness to be in person for the trial violated defendant's rights under the confrontation clause. *Id.* at ¶¶37-38. An attorney is in charge of determinations regarding the strategic choices of how to defend a case while the client remains

fully in charge of substantive decisions such as taking a plea. "No precise test separates fundamental decisions within defendants' control from strategic decisions left to counsel." *Id.* at ¶54. Although *Tribble II* provides guidance on the roles of defendant and counsel, it is important to note that *Tribble II* considered whether defense counsel could stipulate to certain things over the specific objections of his client. *Id.* at ¶ 37.

In *State v. Tribble* 2005 VT 132 ¶ 19, 892 A.2d 232, 179 Vt. 235 (*Tribble 1)* the court considered the situation where the attorney wanted to pursue an insanity defense over defendant's objection. In *Tribble 1*, defense counsel strongly asserted that he would be offering ineffective assistance of counsel and would be put in an impossible position if he was not allowed to withdraw if he could not assert the insanity defense. The *Tribble I* court found that sometimes defense counsel must abide by the client's wishes even if it may not be in their best interests. *See Tribble 1* at ¶ 19. Here, Respondent testified, both personally and through his expert, that seeking a modification of the terms of release *might* not have been in MK's best interest. This position is speculation and was credibly disputed by MK's current lawyer. However, even taking into consideration that MK's decision might ultimately not have been in his best interest in the criminal case, MK plainly had very important reasons to demand the motion be filed. MK's desire to see his children in person was a compelling reason for Respondent to comply with his client's demands.

The fact that MK had maintained his innocence of the charges against him during Respondent's representation of MK is important to the Panel's decision. Our laws have recognized that "parents have a fundamental liberty interest in raising their children." *See* 14 V.S.A. § 2621(4). "It is plain that the interest of a parent in the companionship, care, custody, and management of his or her children 'come(s) to this Court with a momentum for respect

lacking when appeal is made to liberties which derive merely from shifting economic arrangements.'" *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) quoting *Kovacs v. Cooper*, 336 U.S. 77, 95 (149) (Frankfurter, J., concurring). It is not too much to say that the "integrity of the family unit" is a basic civil right. *Stanley*, 405 U.S. at 651. Direct parent-child contact is elemental to this fundamental civil right and liberty interest.

While this case is obviously not about a State effort to deprive MK of his constitutional rights regarding his children, it does, in the Panel's view, support MK's continuing requests that Respondent file a motion to modify his conditions of release for that most important of reasons: the family unit. Respondent should have understood that once he explained the pros and cons of moving to modify, that he had to abide by MK's informed demand that the motion be filed as a means of shortening the length of time during which MK, who claimed to be innocent of any crime, was being deprived of this fundamental liberty interest in seeing his children in person.

MK's position *may not* have been in his best interest in terms of the ultimate disposition of his criminal case; learned attorneys who testified to the Panel offered differing views on that point. That remains to be seen. What is clear is that Respondent's refusal to file the motion lengthened the deprivation of MK's liberty interest until such time that his new attorney filed the motion and successfully obtained for MK the restoration of in-person parent-child contact. Until that time, MK suffered the sort of needless anxiety and sense of his lawyer's untrustworthiness to which Rule 1.3 and its comment 3 are directly addressed. The Panel concludes that Disciplinary Counsel proved, by clear and convincing evidence, that Respondent violated Rule 1.3.

# COUNT 4-VIOLATION OF RULE 1.6 DISCLOSURE OF CONFIDENTIAL CLIENT INFORMATION.

## Rule 1.6.    Confidentiality of Information

Respondent released privileged client information to another attorney without the permission of his client in violation of Rule 1.6. *See* Findings 52-60.

Rule 1.6:

"A lawyer shall not reveal information relating to the representation of a client unless the client gives informed consent, the disclosure is impliedly authorized in order to carry out the representation, or the disclosure is required by paragraph (b) or permitted by paragraph (c)." Vt. R. of Prof. C. 1.6(a). "A fundamental principle in the client-lawyer relationship is that, in the absence of the client's informed consent, the lawyer must not reveal information relating to the representation. . . . This contributes to the trust that is the hallmark of the client-lawyer relationship." Vt. R. of Prof C. 1.6, cmt. 2. While the Rule contains some exceptions where lawyers must or may disclose confidential information, none of the exceptions have any applicability here.

In connection with MK replacing Respondent with a new attorney, Respondent transferred MK's file to Attorney Sleigh. In an email to Attorney Sleigh, Respondent laid out additional information including thoughts that he had regarding his representation of MK and offering suggestions as to defense of the case. Exhibit 19. In addition to commenting on MK's case, Respondent offered that he was also representing another criminal defense client and disclosed confidential client information about this unrelated case, including the client's name and the charges against him. The client, BA, had not consented to Respondent's disclosure of his identifying information or consented to allow Respondent to discuss other details of his case with Attorney Sleigh. BA testified that he had discovered the disclosure from his current attorney, Jessica Burke, who in turn had learned about the disclosure from Disciplinary Counsel.

The email sent by Respondent to Attorney Sleigh was not disclosed by Attorney Sleigh to anyone but Disciplinary Counsel. BA testified that he was shocked that Respondent had disclosed information about his case although did not testify to any actual harm from the disclosure. In *In re Pressly*, 160 Vt. 319, 324, 628 A.2d 927, 930 (1993), the Vermont Supreme Court affirmed a finding of actual injury when a client testified that she was "shocked" when her attorney disclosed her confidences to opposing counsel. The Court found that whether Attorney Pressly had acted negligently, because he thought the disclosure would be in his client's interest, or knowingly, because he knowingly disclosed a client confidence, that under the circumstances a public reprimand was the proper sanction. *See* 160 Vt. at 323, 628 A.2d at 930. There was no evidence that Attorney Sleigh had disclosed information that he received about BA in the context of representing MK.

BA's criminal charges were a matter of public record at the time of the disclosure of his personal identifying information and the charges against him. However, an attorney is prohibited from disclosing even the identity of his clients without their express or implied consent. A lawyer is prohibited from revealing information about a client, even where the disclosure does not itself relay protected information but could reasonably lead to the discovery of protected information. *See* Rule 1.6 cmt. 4. Further, "[a] lawyer's use of a hypothetical to discuss issues relating to the representation is permissible so long as there is no reasonable likelihood that the listener will be able to ascertain the identity of the client or the situation involved." *Id.* Here, Respondent identified BA to Attorney Sleigh in full and discussed his case in some detail when he could properly have discussed the matter hypothetically without violating the Rule.

The Panel rejects Respondent's claim that he could safely share BA's information with MK's new counsel because the information would be protected from subsequent disclosure

under the so-called "joint defense" privilege. Other than superficial similarities between the charges against them, BA and MK were not being tried together or in related prosecutions involving the same complaining witnesses. Respondent has not shown how BA and MK were in any way mounting a joint defense that would allow Respondent to freely, and without client authorization, share information about BA's case with Attorney Sleigh while maintaining privilege over that information. Had Attorney Sleigh wanted to disclose to any other third party the information about BA that Respondent shared, he would have been free to do so.

After reviewing the evidence adduced at the hearing across all counts, the Panel has found that Respondent's disclosure of information related to BA's representation was unauthorized, unnecessary to advance either BA or MK's case, and was self-serving on Respondent's part. Respondent's disclosure of BA's information was made solely to suggest to Attorney Sleigh that there would be some value in having MK continue to retain Respondent as part of the defense team because Respondent's position as a probate judge in Caledonia County could be used to justify transfer of the case to a purportedly more favorable venue. All this was positioning Respondent to continue earning a fee from MK while doing little actual work. BA was a victim of Respondent's careless and selfish conduct.

The Panel therefore concludes that Disciplinary Counsel proved, by clear and convincing evidence, that Respondent violated Rule 1.6.

# COUNT 5-VIOLATION OF RULE 8.4(c) MISREPRESENTATION TO DISCIPLINARY COUNSEL REGARDING THE CIRCUMSTANCES AND SUBSTANCE OF HIS TIMEKEEPING IN THE MK MATTER.

**Rule 8.4(c). Misconduct**

Respondent dishonestly misrepresented to Disciplinary Counsel the substance and circumstances of timekeeping records in connection with the MK matter. *See* Findings 61-67.

Rule 8.4(c):

"It is professional misconduct for a lawyer to: ...(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation." It well-settled in Vermont that dishonesty and misrepresentation by lawyers relating to their legal practice violates Rule 8.4(c). *See In re Wysolmerski*, 2020 VT 54, 212 Vt. 394, 237 A.3d 706; *In re Adamski*, 2020 VT 7, 211 Vt. 423, 228 A.3d 72; *In re Sherer*, PRB Decision No. 228 (2019). "The term 'dishonesty' means, among other things, 'conduct evincing a lack of honesty, probity or integrity in principle' and 'a lack of fairness and straightforwardness.'" *In re Adamski*, 2020 VT 7 at ¶24, 211 Vt. at 431, 228 A.3d at 77 (quotation omitted).

Disciplinary Counsel requested that Respondent provide her with information regarding the time that Respondent had spent on MK's case. Respondent produced as part of the investigation into the complaints against him, a written response dated May 29, 2020. Disciplinary Counsel did not charge Respondent with any changes of an unreasonable fee pursuant to Rule 1.5 but wanted to determine what work Respondent had done for MK for the $8,000 that MK's family had paid to Respondent. Respondent (through his counsel), provided to Disciplinary Counsel what he claimed, through counsel, were eight months' worth of "contemporaneous" time entries of work allegedly performed in MK's case using a software program call FreshBooks. *See* Answer at ¶47, Exhibit 15.

At the hearing, Respondent admitted that the FreshBooks time entries were not created

contemporaneously with work done on the MK file and were only recreated after the fact in response to Disciplinary Counsel's request. Through his testimony Respondent admitted that there may have been dates and times that were not accurate and there might have been "overlap" with other cases upon which he was working contemporaneously with MK file. Because this is not an excessive fee case, the issue is not that Respondent failed to keep contemporaneous time sheets; the issue is that he represented to Disciplinary Counsel that his time entries were contemporaneous and accurate.

Respondent testified that there may have been errors in dates and times but his entries were mainly correct. However, other witnesses testified that they had no recollection of meetings reported by Respondent, such as Alan Franklin, Esq. In addition, Respondent included time entries for meetings with Deputy States Attorney Heidi Remick on June 20, 2019, July 8, 2019, August 19, 2019 and November 11, 2019. Remick testified that none of these meetings ever occurred and Respondent himself admitted he was not sure that they had occurred. The Panel credits the conflicting testimony of these numerous other individuals over that of Respondent.

Respondent attempted to justify his fee by inflating certain charges such as 10.5 hours to researching a specific juror pool and 9.5 hours for a jury questionnaire when there was no jury draw scheduled and where Respondent was aware that the pool would turn over before any jury draw was scheduled. Exhibit 15.

Respondent's FreshBooks program identified time entries made only May 20, 2020 and May 21, 2020. Exhibit 16. These dates were nearly four months after Respondent's representation of MK had ended and in response to Disciplinary Counsel's inquiry regarding his billing. They were not the contemporaneous entries that Respondent represented them to be.

Disciplinary Counsel did not charge respondent with charging an unreasonable fee and the Hearing Panel is unable to impose a penalty for charging an unreasonable fee, much as it might believe the evidence supports such a charge. Rather, the analysis here focuses on whether Respondent misrepresented the actual time spent on the MK file as a means to short-circuit Disciplinary Counsel's investigation and avoid being charged with a violation of Rule 1.5. Respondent did acknowledge at hearing that his FreshBooks summary was a reconstruction of the work and not intended to be a completely accurate and contemporaneous recitation of his timekeeping. It is not errors in the timekeeping that are the issue here, it is that he represented to Disciplinary Counsel that his records were in fact an accurate reflection of the time worked on MK's case when credible evidence shows otherwise.

Pursuant to Rule 8.4(c) it is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation". *See In re Adamski*, 2020 VT 7, ¶24, 211 Vt. at 431, 228 A.3d at 77. "[W]hile Rule 8.4(c) is broad and . . . encompasses conduct both within and outside the realm of the practice of law," it applies only "to conduct so egregious that it indicates that the lawyer charged lacks the moral character to practice law." *In re PRB Docket No. 2007-046*, 2009 VT 115, ¶12, 187 Vt. 35, 42-43, 989 A.2d 523, 528. Here, Respondent was specifically asked to provide information regarding time that he spent on MK's case. In response, he created misleading and false or, at best, grossly erroneous time entries that were represented to Disciplinary Counsel to have been accurate and created contemporaneously with his representation of MK.

In *In re: McCarty*, 2013 VT 47, 194 Vt. 109, 75 A.3d 580, an attorney circumvented the legal process and drafted documents that falsely appeared to be valid court documents requiring a tenant to immediately leave the premises. *See McCarty*, 2013 Vt 47, ¶29, 194 Vt. at 121, 75

A.3d at 597. The Vermont Supreme Court upheld a hearing panel's finding that he had violated several rules of professional conduct, including Rules 8.4(c) and 8.4(d). "All told, his acts of deception in drafting misleading correspondence and making false statements violated rules prohibiting a lawyer from engaging in fraudulent behavior, making false statements, and violating others' rights." *McCarty*, 2013 VT 47, ¶11, 194 Vt. at 115, 75 A.3d at 593. Here, Respondent drafted the FreshBooks entries in an attempt to mislead Disciplinary Counsel during her investigation into the time he had spent in the MK matter.

Respondent also has the duty to cooperate with Disciplinary Counsel during an investigation. *See In re Wysolmerski*, 2020 VT 54, ¶50, 212 Vt. 394, 237 A.3d 706, *In re Farrar*, 2008 VT 31, ¶9 n.2, 183 Vt. 592, 595, 949 A.3d 438, 441 (mem). Respondent's decision to create and present FreshBooks billing entries to Disciplinary Counsel without the caveat that they were very rough approximations, and that he could not guarantee their accuracy was intended to, or had the effect of, portraying to Disciplinary Counsel contemporaneously prepared time slips. Respondent subsequently conceded that not all of the entries were accurate and were entered long after the dates referenced in the FreshBooks time slips. In addition to Respondent's admissions, the testimony of Alan Franklin, Heidi Remick and Thomas Paul also flatly and credibly contradicted many of Respondent's time entries as being over inflated or completely inaccurate.

After listening to all of the testimony presented and observing the witnesses as they presented it, the Panel regrets that it cannot escape the conclusion that Respondent lacks all credibility on this issue. It is clear to the Panel that Respondent's time records, even when considered as reconstructions of time spent based on notes and calendar entries rather than contemporaneous records, bare very little resemblance to reality. The Panel, therefore,

concludes that Disciplinary Counsel proved, by clear and convincing evidence, that Respondent violated Rule 8.4(c).

## Sanctions Analysis

The purpose of the Vermont Rules of Professional Conduct is to "protect the public from persons unfit to serve as attorneys and to maintain public confidence in the bar." *In re Berk*, 157 Vt. 524, 532, 602 A.2d 946, 950 (1991). The goal of sanctions is not to punish attorneys, but rather to "protect the public from harm and to maintain confidence in our legal institutions by deterring future misconduct." *In re Obregon*, 2016 VT 32, ¶ 19, 201 Vt. 463, 145 A.3d 226 (quoting *In re Hunter*, 167 Vt. 219, 226, 704 A.2d 1154, 1158 (1997)).

The Vermont Supreme Court has adopted the ABA Standards for Imposing Lawyer Discipline.

> When sanctioning lawyer misconduct, we have adopted the ABA Standards for Imposing Lawyer Discipline which requires us to weigh the duty violated, the attorney's mental state, the actual or potential injury caused by the misconduct, and existence of aggravating or mitigating factors

*In re Andres* 2004 VT 71, ¶14, 177 Vt. 511, 513,857 A.2d 803, 807.

The ABA Standards provide a presumptive sanction based on the importance of the duty violated, the attorney's culpability and the extent of harm caused to the client. *In re: Fink* 2011 VT 42, ¶35, 189 Vt. 470, 486-87, 22 A.3d 461, 473-74. The presumptive sanction can then be changed based upon a review of existing aggravating or mitigating factors. *Id.*

### Duty violated

The Panel's first duty is to identify whether the duty breached was owed to a client, the public, the legal system as a whole or to the legal profession. *See ABA Standards* § 3.0 at 130.

### Mental State

The Panel must then determine the lawyer's mental state. "The lawyer's mental state

may be one of intent, knowledge, or negligence:" *ABA Standards*, § 3.0, Commentary, at 27.

> Intent. An attorney acts with intent when the acts "conscious objective or purpose to accomplish a particular result." *Id.* Theoretical Framework, at 6.

> Knowledge. An attorney's mental state is "knowledge" when the attorney acts with "conscious awareness of the nature or attendant circumstances of his or her conduct without the conscious objective or purpose to accomplish a particular result." *Id.*

> Negligence. An attorney's mental state of negligence is present where an attorney "fails to be aware of substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the standard of care that a reasonable lawyer would exercise in the situation." *Id.*

## Injury and Potential Injury

The Panel must then determine whether there has been any injury or potential injury. The ABA Standards consider actual or potential injury caused by the attorney's misconduct when considering sanctions. *See ABA Standards*, § 3.06(c), at 26. Injury is "harm to a client, the public, the legal system, or the profession which results from a lawyer's misconduct. The level of injury can range from 'serious' injury to 'little to no' injury." *Id.*, Definitions, at 9. Potential injury refers to an injury that is "reasonably foreseeable at the time of the lawyer's misconduct, and which, but for some intervening factor or event, would probably have resulted from the lawyer's misconduct." *Id.* "The extent of the injury is defined by the type of duty violated and the extent or actual or potential harm." *Id.* at 6.

The Panel then determines the appropriate sanction for each found violation.

## Count 1.    Rule 8.4(d).    Misconduct

Respondent disclosed confidential information contained in a juvenile court file in violation of 33 V.S.A. § 5117. *See* Findings 2-17. Pursuant to Rule 8.4(d) "It is professional

33

misconduct for a lawyer to: ...(d) engage in conduct that is prejudicial to the administration of justice."

**Duty:** Rule 8.4(d) involves Respondent's duty to the legal system and to the legal profession to avoid engaging in conduct prejudicial to the administration of justice.

**Mental State:** Rule 8.4(d) dealing with the juvenile court information evidences an intentional mental state. Respondent intentionally placed identifying confidential information obtained from the juvenile court record in connection with the wrongful death case. The Respondent clearly knew that the juvenile records required careful handling as evidenced by him placing the records themselves in "sealed" envelope. However, he included the personal identifying information and other factual information in his unsealed motion intentionally in order to support his motion for summary judgment.

**Harm:** Respondent caused actual harm by disclosing confidential information from a juvenile proceeding. Confidential information from the record, including information regarding the surviving child (who was not a part of the wrongful death claim), was disclosed. In addition, there was harm to the integrity of the legal system. *See In re George Harwood, Esq.*, PRB File No. 2005-184.

> Rule 8.4(d) is typically applied to misconduct that interferes with a judicial proceeding or compromises the integrity of the legal profession. The integrity of the legal system is founded on the premise that attorneys will be truthful and honest in their dealings with the courts, with clients, and with those whose job it is to ensure that appropriate standards of professional conduct are maintained. The legal system and the profession also require attorneys to cooperate with the disciplinary system and provide information when requested. See A.O. 9 Rule 7(C) 2005. Failure to do so compromises the integrity of the profession and the operation of the legal system and violates Rule 8.4(d).

*Id.*

**Presumptive sanction under the ABA Standards.**

Respondent's violation of 33 V.S.A. §5117 does not fit neatly into a specific category under the ABA Standards. He was not charged with a crime. However, 33 V.S.A. §5117 clearly notes that an unlawful dissemination of the juvenile record is a criminal offense. Therefore, the Panel takes guidance from ABA Standard 5.1.

### 5.1 Failure to Maintain Personal Integrity

> Absent aggravating or mitigating circumstances, upon application of the factors set out in Standard 3.0, the following sanctions are generally appropriate in cases involving commission of a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects, or in cases with conduct involving dishonesty, fraud, deceit, or misrepresentation.

> 5.12 Suspension is generally appropriate when a lawyer knowingly engages in criminal conduct which does not contain the elements listed in Standard 5.11 and that seriously adversely reflects on the lawyer's fitness to practice.

Respondent knew, or should have known, that his intentional disclosure of juvenile records without prior approval of the Court was a criminal violation of the statute. He took limited precautions to file the juvenile record itself in a sealed envelope but then including confidential information from the record in his public motion for summary judgment and statement of undisputed material facts. His intentional disclosure shakes the faith of the public in the confidentiality of juvenile proceedings. Additionally, he disclosed confidential information regarding another juvenile involved with the juvenile proceeding that was not part of the wrongful death case.

The Panel imposes a sanction of a 6-month suspension.

### Count 2.        Rule 1.1        Competence

Respondent was retained by MK. He failed to request and watch the recordings of the victims' interviews was a violation of 1.1.

**Duty:** Rule 1.3 involves Respondent's duty to his client MK to diligently represent him in connection with his criminal case.

**Mental State:** Respondent's mental state with regards to failing to watch recordings of victim interviews while representing MK in his criminal case was negligence. Respondent failed to review the interviews or even request them in a timely manner. He also failed to schedule depositions, although he believed that he would have time to do all of these things because he was confident that the scheduling order would be extended based upon his own experience and the testimony of his expert. *See In re Fink* 2011 VT 42, ¶41, 189 Vt. 470, 489-90, 22 A.3d 461, 475-76. In *Fink*, the court held that the attorney's own subjective belief that he was not charging an unreasonable fee because he was adding to the value of the case supported a mental state of negligence. *Id.*

**Harm:** MK did not suffer any injury as stated by his current counsel David Sleigh. However, there was potential harm if MK's case had come to trial and the court refused additional time. Respondent's lack of preparation could have affected the outcome of MK's trial.

**Presumptive sanction under the ABA Standards.**

**4.5 Lack of Competence**

> Absent aggravating or mitigation circumstances, upon application of the factors set out in standard 3.0, the following sanctions are generally appropriate in cases involving failure to provide competent representation to a client:
>
> 4.53 Reprimand is generally appropriate when a lawyer:
>
> (a) demonstrates failure to understand relevant legal doctrines or procedures and causes injury or potential injury to a client.

Here, Respondent failed to review the victim interviews or to schedule depositions before the expiration of the scheduling order in MK's case, evincing a lack of appreciation of the

36

importance of demeanor evidence in child sexual assault cases and taking for granted the availability of a critical discovery deadline extension when Respondent had no good cause to ignore the deadline.

The Panel imposes a sanction of a Reprimand.

## COUNT 3. Rule 1.3. Diligence

**Duty:** Rule 1.3 involves Respondent's duty to his client MK to diligently represent him in connection with his criminal case and to abide by the client's reasonable requests to file a motion to modify conditions of release so that MK could see his children in person.

**Mental State:** Respondent's mental state as regards as to failing to file the motion to amend conditions of release pursuant to Rule 1.3 is negligence. Although Respondent failed to comply with numerous reasonable requests from his client to file for a considerable period of time, Respondent credibly testified that in his judgment filing a motion to modify could do more harm than good. *See In re Fink* 2011 VT 42, ¶41, 189 Vt. at 489-90, 22 A.3d at 475-76.. In *Fink*, the court held that the attorney's own subjective belief that he was not charging an unreasonable fee because he was adding to the value of the case supported a mental state of negligence. *Id.* The Panel has determined that, based upon all the evidence presented before it, that it was objectively unreasonable to fail to file a motion to modify after pros and cons of the motion had been fully explained to the client and the client still wanted the motion to be filed.

**Harm:** MK suffered actual harm as he was not allowed to have in person contact with his children between the time that MK requested Respondent file a motion to modify and up until Attorney Sleigh obtained a modification of conditions in February of 2020. Respondent did speak with the Caledonia State's Attorney in October 2019 about whether he would agree to the

amendment of conditions of release. However, between October 2019 and January 2020,

Respondent did not take any action to move to modify MK's conditions of release.

**Presumptive sanction under the ABA Standards.**

### 4.4 Lack of Diligence

> Absent aggravating or mitigating circumstances, upon application
> of the factors set out in Standard 3.0, the following sanctions are
> appropriate in cases involving a failure to act with reasonable
> diligence and promptness in representing a client: . . .

> 4.42 Suspension is generally appropriate when:

>> (a) A lawyer knowingly fails to perform services for a client
>> and causes injury or potential injury to a client, or
>> (b) A lawyer engages in a pattern of negligent and causes
>> injury or potential injury to a client.

> 4.43 Reprimand is generally appropriate when a lawyer is
> negligent and does not act with reasonable diligence in
> representing the client and causes injury or potential injury to a
> clint.

Here, Respondent failed to file a motion to modify conditions of MK's release despite

MK's repeated requests to do so. Respondent knew that MK wanted the motion filed and was

being paid ($8,000.00 in total) to do work on MK's behalf. Instead, he did very little work for

MK during the months that he represented him. In *In re Hongisto*, 2010 VT 51, ¶¶ 3 and 15, 188

Vt. 553, 554, 557, 998 A.2d 1065,1067, 1070, the Vermont Supreme Court upheld a suspension

where the respondent took no action after receiving a retainer and repeatedly failed to respond to

numerous phone messages from the client. *In re Blais* 174 Vt. 628, 631, 817 A.2d 1266, 1270

(2002), a suspension was appropriate under § 4.42 where the respondent engaged "in repeated

instances of neglect of client matters" for five separate clients.

Standard 4.43 has been applied where a respondent failed to file a notice of appeal on

time, *In re Andres* 170 Vt. 599, 601, 749 A.2d 618, 620 (2000). 4.43 was also applied in *In re*

*Farrar*, *PRB No. 82* (2005). In *Farrar*, respondent did not provide advice to his client subsequent to an appeal and failed to attend a subsequent hearing on contempt that resulted in an adverse ruling for the client. Here, Respondent failed to file a motion that was reasonably requested by MK and was related to his important parental interests.

The Panel imposes a sanction of a 3-month suspension.

## Count 4. Rule 1.6.    Confidentiality of Information

**Duty:** Rule 1.6 involves Respondent's duty to his client to avoid disclosure of privileged confidential information.

**Mental State:** Respondent's mental state with regards to disclosure of his client's identifying information and details of his criminal case was knowing. Whether Respondent actually knew the disclosure of a client's confidences to Attorney Sleigh was a violation of the client's confidentiality; it is no defense. *See In re Bowen,* 2021 VT 7, ¶35, __ Vt. __, 252 A.3d 300, 311. Respondent knew, or is charged with knowing, that he must maintain confidences pursuant to Rule 1.6.

**Harm:** Here, the injury or potential injury was harm to the client. Although Respondent knowingly disclosed confidential client information to Attorney Sleigh, there was no further dissemination of the information contained in the email. The information was provided to Disciplinary Counsel and then to CH's current attorney. Thus, the disclosure caused injury to the client rather than an injury to the public, the legal system, or the profession. *See Bowen,* 2021 VT 7 at ¶36, __ Vt. __, 252 A.3d at 311.

Respondent's former client testified that he was "shocked" by the disclosure of his confidential information. Thus, there was injury to his client, who had the right to be certain that his attorney would maintain his confidences. Attorney Sleigh did not disclose the information

provided by Respondent to anyone until it was obtained by Disciplinary Counsel in the

investigation of the MK case. There was, additionally, the potential for harm because the email

from Respondent to Attorney Sleigh indicated not only BA's full identity and the charges against

him, but also indications that BA admitted at least some of the charges. Attorney Sleigh did not

owe a duty of confidentiality to keep information regarding a non-client, confidential. However,

he did receive the email in the context of receiving information about his client MK from MK's

former attorney, the Respondent. There is no evidence that Attorney Sleigh intended to or would

disclose the confidential information. However, Respondent's violation in disclosing information

was completely unnecessary. There was no reason to identify BA by name.

**Presumptive sanction under the ABA Standards.**

### 4.2 Failure to Preserve the Client's Confidences

Here, Respondent failed to preserve client confidences when he disclosed his client's

identity and details of his pending criminal matter to Attorney Sleigh in an email regarding MK.

> Absent aggravating or mitigating circumstances, upon application
> of the factors set out in 3.0 the following sanctions are generally
> appropriate in cases involving improper revelation of information
> relating to representation of a client: . . .
>
> 4.22 Suspension is generally appropriate when a lawyer knowingly
> reveals information relating to the representation of a client not
> otherwise lawfully permitted to be disclosed, and this disclosure
> causes injury or potential injury to a client.
>
> 4.23 Reprimand is generally appropriate when a lawyer negligently
> reveals information relating to representation of a client not
> otherwise lawfully permitted to be disclosed, and this disclosure
> causes injury or potential injury to a client.

Respondent divulged client confidences by detailing his identity and charges, as well as

other confidential case information, to Attorney Sleigh. Although the client testified to being

shocked at the disclosure and there was the potential for harm, the disclosure was a single email

to an attorney representing a different, but joint, client of Respondent and the other attorney.

However, the Vermont Supreme Court has found that disclosure, without more than the client's emotional distress, constitutes an actual injury supporting reprimand. *See In re Pressly*, 160 Vt. 319, 324, 628 A.2d 927, 930 (1993). Disclosure of confidential information by an attorney also supports a suspension. *See Bowen,* 2021 VT 7 at ¶41, __ Vt. __, 252 A.3d at 313. In *Bowen*, an attorney was suspended for three months for disclosure of confidential information that he also used to his own advantage. *Bowen*, 2021 VT 7 at ¶ 50, __ Vt. __, 252 A.3d at 316.

The Panel imposes a sanction of a 1.5-month suspension.

### Rule 8.4(c)    Misconduct

**Duty:** Rule 8.4(c) involves Respondent's duty to the legal system and to the legal profession to conduct himself honestly and cooperate with Disciplinary Counsel in her investigation of complaints of misconduct.

**Mental State:** Respondent's mental state as regards his production of misleading time entries pursuant to Rule 8.4(c) is intentional. Respondent provided Disciplinary Counsel with time entries that were represented to be contemporaneous with and accurately reflective of his work on the MK file. He intentionally attempted to mislead Disciplinary Counsel instead of cooperating with her investigation.

"'The lawyer's mental state may be one of intent, knowledge, or negligence.' *ABA Standards*, § 3.0, Commentary, at 27. For purposes of the sanctions inquiry, '[a lawyer's] mental state is [one] of intent, when the lawyer acts with the conscious objective or purpose to accomplish a particular result.' *Id.*, Theoretical Framework, at 6." *In Re: H. Kenneth Merritt, Esq.*, PRB File Nos. 2017-018 & 2017-024 at 18 (Decision #231). Here, Respondent

41

intentionally provided misleading and inaccurate information to Disciplinary Counsel in order to try to justify his fee.

**Harm:** Respondent caused actual harm by not being truthful to Disciplinary Counsel and representing that his billing entries were contemporaneous and accurate. "Likewise, Respondent's failure to cooperate with Disciplinary Counsel's investigation 'injured the disciplinary system itself by consuming scarce resources and eroding the public's confidence in the legal profession.'" *In re Phyllis McCoy-Jacien, Esq.*, 2018 VT 35, 207 Vt. 624, 631, 186 A.3d 626, 634 (quoting *In re Hongisto*, 2010 VT 51, ¶11, 188 Vt. at 556, 998 A.2d at.1069.

Respondent asserts that he did not attempt to mislead the Disciplinary Counsel, but if she had not examined the time entries more closely, reviewed the actual entries that showed all of the bills had been entered in a two day span months after his representation of MK had ended, and spoken to a number of witnesses about Respondent's activities on the file, he would have successfully evaded admitting the truth about his billing.

**Presumptive sanction under the ABA Standards.**

### 5.1 Failure to Maintain Personal Integrity

> Absent aggravating or mitigating circumstances, upon application of the factors set out in Standard 3.0, the following sanctions are generally appropriate in cases involving commission of a criminal act that reflects adversely on a lawyer's honesty, trustworthiness, fitness as a lawyer in other respects, or in cases in conduct involving dishonesty, fraud, deceit, or misrepresentation:
>
> 5.11 Disbarment is generally appropriate when:
>
> > (b) A lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice.
>
> > 5.13. Reprimand is generally appropriate when a lawyer knowingly engages in any other conduct that involves dishonesty, fraud, deceit, or

misrepresentation and that adversely reflects on the lawyer's fitness to practice law.

## 6.0 Violation of Duties Owed to the Legal System

Absent aggravating or mitigating circumstances, upon application of the factors set out in Standard 3.0, the following sanctions are generally appropriate in cases involving conduct that is prejudicial to the administration of justice or that involves dishonesty, fraud, deceit, or misrepresentation to a court:

6.11 Disbarment is generally appropriate when a lawyer, with the intent to deceive the court, makes a false statement, submits a false document, or improperly withholds material information and causes serious or potentially serious injury to a party, or causes a significant or potentially significant adverse effect on the legal proceeding.

6.12 Suspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to a court or that material information is improperly being withheld, and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potential adverse effect on the legal proceeding.

Here, Respondent intentionally submitted misleading and erroneous information to Disciplinary Counsel in an attempt to justify his fee in the MK matter.

The Panel imposes a sanction of a 3-month suspension.

### Aggravating Factors Under ABA Standard 9.22

After having established baseline sanctions for each of Respondent's violations, the panel may consider eleven enumerated factors in aggravation when determining an appropriate final sanction. The evidence supports the following conclusions relevant to these factors.

a. *Prior disciplinary offenses*: Respondent has no prior disciplinary history.

b. *Dishonest or selfish motive*: This factor applies. Respondent's motive in submitting inaccurate time-keeping records to Disciplinary Counsel was an attempt to avoid

43

potential disciplinary action where MK had complained of Respondent's bill.
Similarly, his unauthorized disclosure of information relating to BA's case was also
calculated to persuade MK's new attorney to retain Respondent as part of MK's legal
team so that Respondent could continue earning a fee in the case while doing very
little actual work.

c.  *Pattern of misconduct*: The Panel does not apply this factor here because we see no
    pattern outside of the multiple offenses charged in this case. We therefore apply the
    following aggravating factor.

d.  *Multiple offenses*: This factor applies. Respondent's conduct occurred in three
    separate client matters, involved several rules violations and affected multiple
    individuals and the legal and disciplinary systems.

e.  *Bad faith obstruction of the disciplinary proceeding*: This factor applies.
    Respondent's offer of inaccurate time-keeping records was an attempt to obstruct the
    disciplinary proceeding.

f.  *Submission of false evidence, false statements, or other deceptive practices during the
    disciplinary process:* This factor applies. Respondent's submission of inaccurate
    time-keeping records in response to Disciplinary Counsel's request was dishonest and
    deceptive.

g.  *Refusal to acknowledge wrongful nature of conduct*: This factor applies. Respondent
    does not acknowledge that there was anything wrong about his conduct.

h.  *Vulnerability of victim*: This factor applies. Client MK relied on Respondent to
    represent him in serious pending criminal charges and also wanted to be able to see
    his children when Respondent failed to move to modify his conditions of release.  BA

was incarcerated also facing serious charges when Respondent disclosed his confidential client information. The juveniles who were parties to the DCF proceedings, including the still-living child, had sensitive information about their abusive childhoods disclosed by Respondent in publicly filed documents.

i. *Substantial experience in the practice of law*: Respondent has practiced for more than 20 years and therefore has substantial experience. *See In re Disciplinary Proceedings Against Ferguson*, 246 P.3d 1236, 1250 (Wash. 2011) (concluding that "substantial experience" means 10 or more years of practice at the time of the misconduct).

j. *Indifference to making restitution*: This factor does not apply because apparently no client nor Disciplinary Counsel sought restitution.

k. *Illegal conduct, including that involving the use of controlled substances*: This factor applies because the mishandling of juvenile court documents is a violation of Vermont Statute. However, he was never charged with a crime.

## Mitigating factors under ABA Standard 9.32

The panel may consider thirteen enumerated factors in mitigation when determining an appropriate sanction. The evidence supports the following conclusions relevant factors.

a. *Absence of a prior disciplinary record*: This factor applies.

b. *Absence of a dishonest or selfish motive*: This factor does not apply because of Respondent's attempts to mislead Disciplinary Counsel regarding his time-keeping entries.

c. *Personal or emotional problems*: This factor does not apply. Respondent presented no evidence of any personal or emotional problems.

d. *Timely good faith effort to make restitution or to rectify consequences of misconduct*: This factor does not apply to the circumstances of Respondent's matter. Specifically, he never took any action to rectify his disclosure of the juvenile court proceedings or to return any of his fees collected in the MK matter.

e. *Full and free disclosure to disciplinary authority or cooperative attitude toward proceedings*: This factor does not apply. Specifically, he attempted to mislead Disciplinary Counsel by providing her with inaccurate time-keeping records.

f. *Inexperience in the practice of law*: This factor does not apply. Respondent has over 20 years' experience as an attorney.

g. *Character or reputation*: This factor does not apply to the circumstances of Respondent's matter.

h. *Physical disability*: This factor does not apply to the circumstances of Respondent's matter.

i. *Mental disability or chemical dependency*: This factor does not apply to the circumstances of Respondent's matter.

j. *Delay in disciplinary proceedings*: This factor does not apply to the circumstances of Respondent's matter.

k. *Imposition or other penalties or sanctions*: This factor does not apply to the circumstances of Respondent's matter. The Panel acknowledges that Respondent already received a sanction from the judicial conduct board for related conduct, however, does not consider the actions of the judicial conduct matter either aggravating or mitigating factors.

46

l. *Remorse:* This factor does not apply to the circumstances of Respondent's matter as Respondent has evidenced little remorse and any remorse indicated has occurred only in response to the charges against him and thus appears to be motivated by his desire to lessen or avoid sanctions.

m. *Remoteness of prior offenses:* This factor does not apply to the circumstances of Respondent's matter.

Based on the Panel's evaluation of aggravating and mitigating circumstances, the Panel orders and additional 1.5 month suspension, bringing the total period of suspension to 1 year and 3 months.

## ORDER

Based on the Panel's Findings of Fact and Conclusions of Law, it is hereby

ORDERED, ADJUDGED and DECREED that Respondent, William W. Cobb, Esq., is publicly reprimanded for his violation of Rule 1.1 of the Rules of Professional Conduct, and suspended for a total of one year and three months for his violations of Rules 8.4(d), 1.3, 1.6, and 8.4(c) under aggravating circumstances.

Dated: May 24, 2022

**Hearing Panel No. 1**

_____
Anthony Iarrapino, Esq., Chair

_____
James Murdoch, Esq., Member
(sitting by special designation)

Scott Hess, Public Member

48